Filed 5/2/25  In re J.L. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | H052018<br>(San Benito County<br> Super. Ct. No. JV-21-00027) |
| SAN BENITO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br> A.L.,<br><br>        Defendant and Appellant. | |

On November 16, 2021, the San Benito County Health and Human Services Agency (Agency), filed a juvenile dependency petition alleging the failure of the mother, D.L. (Mother) and the father, A.L. (Father) to protect and provide support for their minor child, J.L., under Welfare and Institutions Code section 300, subdivision (b)(1).[1]  The Agency alleged that Father, who had sole physical and legal custody of J.L., was unable to supervise or protect J.L. adequately because of Father's alcohol abuse.  The Agency also alleged that Mother, whose reunification services with J.L. had previously been terminated in a prior dependency matter, continued to struggle with alcohol and

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

substance abuse.  On November 22, 2021, the juvenile court ordered that J.L. be detained and placed in protective custody.

The juvenile court later ordered that J.L. be removed from Mother and Father's (the parents) care, while granting them reunification services.  Following a contested twelve-month hearing, the court terminated the parents' reunification services and scheduled a selection and implementation hearing pursuant to section 366.26 (section 366.26 hearing).  The Agency ultimately recommended a parental plan of adoption and termination of Mother's and Father's parental rights, which the court adopted.

On appeal, Father contends that a crucial page of the Agency's report for the section 366.26 hearing, namely, the page informing the court of Father's relationship and visitation with J.L., was missing.  He therefore argues that because the information on this page was not before the court, he was denied constitutional due process and a meaningful opportunity to be heard on whether his parental rights should be terminated. He further argues that the trial court erred in failing to find that an exception to adoption had been proven.  In the alternative, he argues that he received ineffective assistance of counsel based on counsel's failure to object to the missing page or the introduction of testimonial evidence regarding his visitation with J.L.

For the reasons stated below, we find no merit to Father's claims and affirm.[2]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Petition and Detention (November 2021)

#### 1.  Petition and Allegations

On November 16, 2021, the Agency filed a juvenile dependency petition alleging that six-year-old J.L. came within the juvenile court's jurisdiction because he had suffered, or was at substantial risk of suffering, serious physical harm "as a result of the failure or inability of his or her parent or legal guardian to supervise or protect the child

___

[2] By separate order, the habeas corpus matter filed by Father in Case No. H052878 related to the same underlying juvenile case was summarily denied on May 2, 2025.

adequately." (See § 300, subd. (b)(1).) The Agency alleged that on October 9, 2021, Father was reported to be heavily intoxicated at a local bar, while J.L. was sitting unsupervised in Father's car parked outside the bar. Mother later arrived and observed J.L. alone in the car, then saw Father outside the bar. Mother reported that Father was intoxicated and arguing with Mother's sister and her friend. Father then grabbed J.L. by the wrist and tried to pull him away from Mother. Father was subsequently arrested.

The Agency additionally alleged that at the time of this incident, Mother confirmed she was continuing to use methamphetamine and drink alcohol. The Agency then spoke to J.L., who stated that Father was "drunk because he drinks too much. He is sick, he wants to drive too fast." Father later admitted that he had consumed nine beers outside the bar while J.L. sat alone in Father's vehicle.

In an amended petition filed on November 17, 2021, the Agency indicated that Mother had an 18-year history of criminal convictions involving drugs, including methamphetamine, and had been ordered to rehabilitative services on multiple occasions. The Agency further noted that due to both parents' chronic history of substance and alcohol abuse, J.L. was placed in protective custody in 2019, and court-ordered services were provided from then until February 2021. The case was closed in March 2021 with successful reunification to Father, who was granted full physical and legal custody, and termination of reunification services to Mother. However, Father admitted that he resumed drinking in June 2021, approximately three months after he had completed services.

The Agency additionally reported that Father had three prior convictions for driving under the influence of alcohol in 2017, 2018, and 2019, and was unlicensed. Further, as a result of the October 9, 2021 incident, Father had been arrested on charges of child abuse and battery on a former partner or spouse.

Finally, the Agency noted that Father had not been abiding by the safety plan initiated on October 9, 2021. Pursuant to this plan, J.L. was placed in the care of his

3

maternal grandmother, who agreed to contact law enforcement if Father attempted to pick up J.L. On November 8, 2021, the Agency learned that the terms of the safety plan were not being followed, thus placing J.L. in substantial risk of harm.

Neither the initial nor amended petitions recommended that J.L. be detained or removed from Father's custody.

### 2. Detention Hearing

An initial detention hearing was held on November 22, 2021. In anticipation of the hearing, the Agency prepared another report and changed its recommendation to now support detention. The Agency indicated that its recommendation was based on Father continuing to display unsafe decision making and lack of insight into his substance abuse problem, even after receiving 18 months of services. The Agency noted that Father continued to allow Mother to be around J.L., despite knowing Mother's history with drugs and her own admission to currently use. In addition, after the safety plan was put into place on October 9, Father disregarded the plan by repeatedly asking to pick J.L. up from his maternal grandmother, including within less than 24 hours of the safety plan being implemented, and had violated the plan by taking custody of J.L. from October 29 through November 4. Father also questioned the Agency's integrity and goals, and displayed a lack of insight into how his actions were placing J.L. at serious risk of harm. The Agency therefore recommended that J.L. be detained and an out of home placement be made.

At the hearing, the court found that a prima facie showing had been made with respect to the allegations in the petition and ordered that J.L. be detained and temporarily placed under the Agency's care, custody, and control.

### B. Jurisdictional/Dispositional Orders (December 2021 and January 2022)

### 1. Jurisdictional Hearing

A contested jurisdictional hearing was scheduled for December 20, 2021. In anticipation of the hearing, the Agency's report recommended that the court continue

4

J.L.'s out of home placement until disposition. In addition to the allegations in the initial petition and detention report, the Agency indicated that on November 30, 2021, Father admitted he had not abided by the safety plan at all, and J.L. had been in his custody the entire time that the plan was meant to be in effect. The Agency noted that both parents continued to struggle with substance abuse, and Father admitted that he continued to consume alcohol, including immediately following his October 9 arrest, and had previously consumed alcohol on days when J.L. was in his care. At the December 20 hearing, the court adopted the recommended findings and order from the report, found the allegations of the amended petition true, and ordered that J.L. remain in his out of home placement pending disposition.

### 2. *Dispositional Hearing*

On December 29, 2021, the Agency filed a report in anticipation of the disposition hearing. In its report, the Agency recommended that that the court sustain the petition, adjudge J.L. as a dependent of the court, have J.L. remain in out of home care, and offer reunification services to Mother and Father. J.L. had been placed in a nonrelative resource family approved (RFA) home in San Benito County.

According to the Agency, Mother admitted to currently using alcohol and methamphetamine, but was aware that she needed to work towards sobriety and obtain counseling to help her address past trauma from being in abusive relationships. In contrast, Father felt he primarily needed to work on his parenting skills, and did not believe he required substance abuse or similar services because such courses only taught how to "fear" drinking, as opposed to assisting in stopping drinking entirely.

The Agency concluded that J.L. would be at substantial risk of harm if he were returned to either parent. In addition to Father resuming alcohol consumption only 18 months after successfully reunifying with J.L., Father had not demonstrated his willingness or ability to protect J.L. from Mother, who continued to engage in substance abuse. Father also did not believe he had a substance abuse problem or that he needed

5

treatment. With respect to Mother, she admitted to currently using methamphetamine, and had not reunified with J.L. in 2021 after receiving services to address past drug and substance abuse concerns. Mother also indicated that she would be losing her housing soon, thus reflecting that she did not have a safe environment for J.L. to live in if she were to be awarded custody. Further, the Agency expressed concern that Mother had not demonstrated a willingness or ability to protect J.L. from Father's substance use, as Mother did not take any steps to ensure J.L. was safe in Father's care despite being aware that Father had begun consuming alcohol again.

At the uncontested dispositional hearing on January 3, 2022, the court declared J.L. as a dependent of the court, and ordered family reunification services to the parents along with visitation in accordance with their case plans. A six-month review hearing was set for June 27, 2022.

## C.     Six-Month Review

On June 22, 2022, the Agency filed a report in anticipation of the six-month review hearing. The Agency reported that apart from attending one Child and Family Team Meeting in February, Mother had not complied with her court-ordered case plan. Mother had been referred to mental health therapy, but did not attend her scheduled intake appointments and had yet to schedule a new one. Mother had also not complied with substance abuse counseling requirements and frequently missed appointments and group sessions, resulting in her being discharged from substance abuse services in May 2022. Although Mother indicated she had been sober since April 2022, she stated that she was still using "on occasion," and failed to submit to regular drug testing or enroll in Alcoholics Anonymous Meetings as required under her case plan.

Mother consistently attended her supervised visitation during the review period, which consisted of visitation once a week for one hour. The Agency reported that apart from one visit where J.L. threw a tantrum, Mother's visitation was going well, as she

6

engaged and interacted well with J.L., brought appropriate snacks and activities, and promptly addressed any behavior concerns promptly.

With respect to Father, the Agency reported that he had complied with a number of requirements of his court-ordered case plan, including: (1) attending a Child and Family Team Meeting; (2) attending a mental health intake appointment; and (3) successfully completing parent education programs. Father had also partially complied with substance abuse counseling and testing requirements, but had missed a number of group sessions and seemed more focused on what he felt the Agency was not doing to support reunification.

Father also consistently attended his supervised visitation during the review period, which consisted of visitation once a week for one hour. While the Agency reported that visits were going well overall, Father would often use time during the visits to address his concerns with his case and social worker, and raised his voice to the social worker on one occasion, causing J.L. to ask Father why he was fighting. On one occasion, J.L. had a tantrum because he wanted a toy, and Father ultimately gave in and bought him one instead of talking to him about why he could not have one.

The Agency also expressed concern that Father had refused to make himself available or meet with staff from the Agency during the review period, and had expressly indicated he would only meet Agency staff in court. As a result, the Agency had not been able to meet with Father to assess his progress, review his case plan, or discuss anything regarding J.L.

It was concluded by the Agency that Mother: (1) had not engaged in services; (2) had not made progress; and (3) had not been able to maintain her sobriety. The Agency also concluded that while Father had engaged in services, made minimal progress, and appeared to be maintaining sobriety, his failure to maintain contact and make himself available to the Agency made it difficult to fully assess his current circumstances and progress. In addition, Father continued to minimize both parents' substance abuse issues

7

and had not demonstrated his ability to protect J.L. from these behaviors. The Agency therefore recommended that reunification services be continued for both Mother and Father.

At the hearing on June 27, 2022, the court adopted the recommendations of the Agency and continued reunification services for Mother and Father. A twelve-month review hearing was set for December 8, 2022.

### D. Twelve-Month Review

On December 7, 2022, the Agency filed a report in anticipation of the twelve-month hearing. The Agency indicated that on August 24, 2022, Father had been arrested on charges of felony driving under the influence of alcohol, driving without a license, and making threats to a police officer. Father's bail was set at $100,000, and he remained incarcerated for most of the review period. On December 2, 2022, Father pled no contest to all three charges and was awaiting sentencing at the time of the Agency's report.

The Agency indicated that at the time of his arrest, Father's blood alcohol level was 0.194%. Father later reported that he had purchased three bottles of tequila on August 22 and secretly began drinking at work the next day, which resulted in him consuming the majority of the bottles. He then began driving home, but felt unwell and pulled over on the road to sleep. After Father awoke, he began driving to a local restaurant but was pulled over by law enforcement and subsequently arrested for driving under the influence. Father claimed that he "did not think it was anything criminal" because he had just consumed alcohol and had not assaulted or robbed anyone.

The Agency noted that due to Father's incarceration, he had not been able to comply with certain portions of his case plan, including additional parental education courses. While Father had partially complied with substance abuse counseling through July 2022, he stopped attending sessions in August 2022 shortly before his arrest. However, in September 2022, Father began regularly attending substance abuse counseling in jail and was reportedly engaging well in his sessions. In addition, prior to

8

his arrest, Father had submitted to drug tests, which were all negative, and had been attending Alcoholics Anonymous and Narcotics Anonymous sessions in jail.

Prior to his arrest, Father had consistent weekly visitation with J.L. However, when he missed his visit on August 25, 2022, J.L. had a difficult time and became very upset. J.L. had been experiencing more behavioral difficulties since the visits stopped. He later told his social worker to communicate to the parents that "it was not ok to not attend a visit," he missed visiting Father, and he wanted Father "to behave and be good."

With respect to Mother, the Agency reported that Mother continued to not engage in services, including mental health counseling, substance abuse counseling, and substance abuse testing. While Mother generally was consistent with her weekly visitation with J.L., the Agency indicated that she was frequently late, resulting in the visits lasting less than an hour. Mother also missed a number of visits, and often did not communicate that she would not be attending the visit until contacted to ask where she was.

The Agency further noted that J.L. had been experiencing behavioral issues at school, including aggressive and disruptive behaviors that resulted in him either being sent to the principal's office, or the principal or vice-principal being called to his classroom almost daily. Academic personnel also confirmed that J.L.'s behavior began to worsen after Father was arrested. J.L. had been provided with mental health services to assist him with processing his emotions in a healthy manner, and an Individualized Education Plan (IEP) to assist him with educational difficulties. However, the Agency noted that J.L.'s placement had changed during the review period after his prior caretakers had to repeatedly leave work early to pick up J.L. from school due to his behavioral issues, and they could no longer maintain the placement as a result. While J.L. was familiar with the new placement, as he had previously been placed there briefly during the prior dependency case, he expressed that he was sad to be leaving his previous caregivers, and was "bored" because his new caregivers were not as active.

9

The Agency concluded that like the previous dependency case, Mother did not take advantage of the services offered as she did not engage in services, did not make progress, remained homeless, and had not been able to maintain sobriety. The Agency also concluded that Father's choice to resume drinking only a few months after successfully reunifying with J.L., and his actions that led to the October 2021 arrest, reflected he was making unsafe decisions and lacked insight into his alcohol issues even after receiving 18 months of services. Father also made another unsafe decision by choosing to drive after drinking a substantial amount of tequila, which led to his August 2022 arrest. The Agency determined that based on Father's actions, he had not fully resolved his substance abuse issues and was not taking accountability for his actions or their effect on J.L.'s mental and physical health. The Agency therefore believed that further services would not be beneficial to for the family, and recommended that reunification services be terminated for both Mother and Father.

The December 8, 2022 hearing was continued at Father's request, who indicated he wished to set the matter for a contested hearing. On February 16, 2023, Father indicated he no longer wished to move forward with a contested hearing, and instead requested that the court consider J.L.'s maternal aunt for guardianship. The court adopted the recommendations of the Agency and terminated reunification services for Mother and Father. At the Agency's request, a selection and implementation hearing was scheduled for June 15, 2023.

E.     *Selection and Implementation Proceedings*

   1. *August 2023 Proceedings*

      a. *Adoption Assessment and Agency Report*

An adoption assessment was performed by the California Department of Social Services (CDSS) on June 1, 2023. The assessment concluded that J.L. was likely to be adopted, and recommended that the court order a plan of adoption without terminating the parental rights of Mother and Father. The assessment noted that J.L. had

10

been in five placements since the inception of his case, and had been in his current placement with his maternal relatives in Bakersfield since March 2023. The maternal relatives were interested in adopting J.L. once he had reached an adequate level of behavioral and emotional stability in their home. The assessment indicated that J.L. continued to have difficulty regulating and appropriately expressing his emotions, and had already engaged in disruptive behavior at his new school, which he began attending shortly after moving to Bakersfield. However, the assessment found that J.L. enjoyed his current placement and felt safe with his caregivers, and was happy to be living with family.

The assessment additionally noted that beginning in March 2023, Father had been able to engage in video visits with J.L., and Mother was also engaging in visits once a month with J.L. However, in reviewing whether J.L. would benefit from continued contact with his parents, the assessment concluded that the parents had not mitigated the issues that resulted in J.L.'s dependency, and were not able to provide him with a safe and stable home. Although the assessment did not recommend that parental rights be terminated, it concluded that the exception to termination as set forth in section 366.26, subdivision (c)(1)(B)(i)[3], did not apply, and termination would not be "significantly unfavorable" to J.L.

The Agency subsequently prepared a report on June 6, 2023, recommending a permanent plan of adoption without terminating Mother's and Father's parental rights. In addition to the information provided in the adoption assessment, the Agency indicated that since the February 2023 court hearing, both Mother and Father were consistently

---

[3] This section provides, in relevant part, that if a court determines by clear and convincing evidence that a child will be adopted, it shall order adoption and terminate parental rights unless it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

attending supervised visits with J.L. once a month, which had been going well, and the Agency recommended that these visits continue.

### b. Section 388 Petition

Prior to the hearing, Father filed a petition pursuant to section 388[4] requesting that reunification services be reinstated for an additional six months. In his petition, Father indicated that he had completed a number of classes and programs while in jail, and also attended three virtual visits with J.L. Father noted that J.L. was "bonded" to him, had been struggling in foster care, and would benefit from further visitation and services in order to obtain more stability. Father also indicated that he would be released shortly from jail, thus allowing him to resume visits and provide J.L. with a stable and loving home.

### c. Hearing

On August 10, 2023, the court held a joint hearing on Father's section 388 petition and the section 366.26 proceedings. At the hearing, Father's counsel argued that he had made "tremendous progress" on his sobriety even while incarcerated, acknowledged his failings and shortfalls, and had made substantial changes that would justify him receiving more time to engage in services. In opposition, the Agency argued that Father's track record of short periods of sobriety, followed by relapses, provided a "forecast" of what Father was capable of doing, and therefore did not constitute changed circumstances. The Agency further argued that the maximum time for offering future services, which was 18 months, had already passed. Minor's counsel agreed with the Agency that Father had not demonstrated changed circumstances warranting further reunification services,

---

[4] This section provides, in pertinent part, that a parent may, "upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court … for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

and indicated that the focus of the proceedings should shift to achieving permanency for J.L.

The court denied Father's petition and found that while Father was making "some effort," that did not constitute a substantial change in circumstances given his past history and lack of understanding of the steps needed to maintain sobriety. The court subsequently adopted the recommendations in the Agency's report for a permanent plan of adoption without terminating Mother's and Father's parental rights. A further selection and implementation hearing was set for February 8, 2024.

### 2. February 2024 Proceedings

#### a. Further Adoption Assessment and Agency Report

An updated CDSS adoption assessment was performed on January 12, 2024. The assessment again concluded that J.L. was likely to be adopted and recommended the court order a plan of adoption; however, the updated assessment recommended that parental rights be terminated. The assessment noted that: (1) J.L.'s grades had improved in all subjects; (2) his mental and emotional stability had also improved; and (3) he had adjusted well to his new home and school. J.L. also expressed that he wanted to be adopted by his maternal relatives and felt safe in their home, though he did wish to continue seeing Father. Although the specialist performing the assessment had not observed any visitation with the parents, the visitation supervisor at the Agency had reported that J.L. continued to have visits once a month for an hour with Mother and Father, and that he enjoyed these visits. However, prior to visits with Father, J.L. regularly told his caregivers he would "be back" in an hour, and only asked about subsequent visits with Father, but not with Mother. The assessment again concluded that terminating parental rights due to J.L.'s relationship with Mother and/or Father would not be detrimental to him, particularly given both parents' inability to meet J.L.'s needs and provide him with a safe and stable home.

13

The Agency also prepared an updated report on January 25, 2024, in anticipation of the continued selection and implementation hearing.  The Agency similarly recommended a permanent plan of adoption with termination of Mother's and Father's parental rights.  The report did not contain information regarding visitation between J.L. and Father since the last hearing.  However, the Agency noted that J.L. had displayed the most progress to date during the past 11 months spent in his current placement, and his maternal relatives had demonstrated their attentiveness to J.L.'s needs and desire to raise him in a healthy and loving home.

### b.  *Section 388 Petition and Opposition*

On February 20, 2024, Father filed a new section 388 petition requesting additional reunification services, increased visitation, and maintaining the current guardianship with a goal of allowing Father to co-parent J.L.  In support of his request, Father provided documentation that he had completed a number of classes related to parental accountability and was "well engaged" in treatment for substance abuse, including negative test results for alcohol and drugs

In opposition, the Agency argued that Father had not demonstrated a substantial change in circumstances, particularly given his history of relapsing after maintaining sobriety for short periods of time.  The Agency also noted that the instant case was the second one involving J.L., and was opened only eight months after Father had reunified with J.L. after J.L was removed under similar circumstances involving general neglect and substance abuse.  The Agency further argued that changing the permanent plan from adoption to guardianship would not be in J.L.'s best interests, particularly given the improvements in J.L.'s behavior after being in the same placement for a sustained period of time, as well as his desire to be adopted by his relatives and be safe.

### c.  *Hearing*

On February 22, 2024, the court held a joint hearing on Father's new section 388 petition and the continued section 366.26 proceedings.  At the hearing, Father 's counsel

14

argued that Father had done "a lot of work" to rehabilitate himself and address his substance abuse problems. Counsel acknowledged that Father recognized the necessity for J.L. to have permanency, but still wanted an opportunity to "redeem" himself and remain a part of J.L.'s life and upbringing. Counsel therefore asked that the court "assist in [Father] not having his parental rights terminated. Or at least, if they are terminated, to allow some sort of visitation or contact with his son."

In response, the Agency argued that Father was attempting to shift the focus from what was best for J.L. to what Father wanted, without showing changed circumstances that would justify a modification of the permanent plan of adoption. The Agency also noted that J.L. had been in out of home placements for more than half of his life as a result of the two dependency matters, and was finally doing well and achieving stability in his current home with his relatives/prospective adoptive parents. Minor's counsel joined in the Agency's argument and similarly contended that Father failed to demonstrate his request was in J.L.'s best interest or furthered the goal of permanency.

Prior to making its ruling, the court asked the Agency to summarize J.L.'s contact with Father, to which the Agency responded: "Up to this point he's had monthly visits, one per month. And the adoptive parents are given the option to enter into a post adoption contact agreement. And I believe they have declined to do that. [¶] And once parental rights are terminated, it's up to the adoptive parents whether or not they're going to, as the parents of the child, allow any future contact with the birth parents." The Agency also confirmed that J.L. wished to be adopted.

The court ultimately concluded that Father had been given "ample opportunity to remedy this situation he finds himself in, and to do everything he could for his child, and ensure that relationship and possible reunification." The court therefore found no changed circumstances and denied Father's motion. The court adopted the recommended findings and orders in the Agency's report for a permanent plan of adoption and termination of parental rights to both parents.

15

Father timely appealed.

## II.    DISCUSSION

### A.    *Due Process Violation*

Father argues that a page was missing from the Agency's January 25, 2024 report, namely, the page that should have contained information regarding the history of his contacts with J.L. and which included information regarding Father and J.L.'s visitation prior to the February 2024 hearing. Father further argues that the court improperly accepted the Agency's statement on the record of this information as true, without requiring sworn testimony or allowing Father the opportunity to conduct cross-examination. Father claims that because such information was "exculpatory evidence" relevant to the issue of terminating his parental rights, the omission of such information constituted a violation of his constitutional due process rights and deprived him of a fair opportunity to be heard. In response, the Agency argues that because Father did not object to the missing page in the juvenile court, he has forfeited this claim on appeal.

Based on the information before us, we agree that Father forfeited this issue based on his failure to object to the missing page and purported missing information regarding visitation.

### 1. *Applicable Law*

The purpose of a section 366.26 report is to provide the juvenile court with the information necessary to determine the permanent plan for the children. (See *In re B.D.* (2019) 35 Cal.App.5th 803, 821.) To that end, the agency supervising the child and the adoption agency are both required to prepare an assessment that must include, among other things, the following: "A review of the amount of and nature of any contact between the child and their parents or legal guardians and other members of their extended family since the time of placement." (§ 366.21, subd. (i)(1)(B).)

Where "no objection to the sufficiency of the assessment reports was made at time of trial, [we] refer to the familiar principle that failure to object to the admission of

16

improper or inadequate evidence [forfeits] the right to raise the issue on appeal. [Citation.] If the complaint on appeal be deemed not the admissibility … of inadequate assessment reports, but substantive insufficien[c]y to establish requisite findings, this complaint, too, [is] [forfeited] by failure to raise it at the trial level. [Citation.]" (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–412, fn. omitted (*Crystal J.*); see also *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 [by failing to object in the juvenile court to specific defects in the reports, parents forfeit any challenge to them on appeal].) " 'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]' [Citation.]" (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 672.)

### 2. *Forfeiture*

In reviewing the record, we agree with Father that the Agency's report dated January 25, 2024, appears to be missing a page, as the page numbers go directly from page 8 to 10, and the report does not contain information regarding Father's visitation with J.L., which appeared in all of the Agency's prior reports. With that said, it is undisputed that Father failed to raise any objections below regarding the admission of the report, including any specific objections regarding the missing page and the information it purportedly contained regarding his visitation with J.L. However, Father claims that because the missing page contained "exculpatory evidence," its omission constituted a violation of his due process rights, a constitutional issue which he may raise for the first time on appeal.

We find no merit to this claim. " 'Where [ ] the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and does address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process.' [Citations.] Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights. Such deficiencies,

17

however, will ordinarily not amount to a deprivation of procedural due process." (*Crystal J., supra,* 12 Cal.App.4th at p. 413.)

In the instant case, the Agency's report was prepared almost a month in advance of the selection and implementation hearing, and addressed the principal question at issue, namely, J.L.'s likelihood of adoption. In addition, while the Agency's report did not contain information regarding Father's visitation with J.L., the record reflects that the missing page was not the sole evidence available regarding this information. The updated adoption assessment prepared prior to the February 2024 hearing indicated that the visitation supervisor had reported Father and J.L. continued to have monthly visitation.[5] Further, Father was aware that visitation would be at issue at the section 366.26 hearing, and therefore had every incentive to ensure the court had an adequate record before it on this issue; indeed, Father *himself* provided a letter from the executive director of his parenting education program, which documented the number of video and in-person visits he had with J.L. as of February 2024.

Accordingly, we conclude that no due process violation occurred due to the omission of the page in question, and Father's failure to object on this basis constituted forfeiture.

### B.     *Applicability of Beneficial Parent-Child Relationship Exception*

Father argues that he met his burden in establishing that there was a beneficial parent-child relationship between him and J.L., which serves as an exception to adoption or termination of parental rights. He therefore claims that the trial court erred in not applying the exception and terminating his parental rights.

---

[5] Although Father claims such evidence was unreliable because the assessment specialist did not personally supervise or observe these visits, we note that no such requirement is contained in section 366.21 regarding the required information for the assessment.

18

### 1. *Applicable Law*

"At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.  [Citations.]  [¶]  Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).  [Citations.]  Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' "
(*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.)

"The party claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. [Citation.]"  (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295 [finding that failure to raise an exception to adoption at the hearing below results in waiver of the issue on appeal]; see also *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)  The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies.  (*Id.* at p. 1252; see also *In re Erik P.* (2002) 104 Cal.App.4th 395, 402–403.)

### 2. *Forfeiture*

As a threshold matter, the Agency argues that because Father failed to raise the exception at the trial level, he has forfeited it on appeal, and the juvenile court was under no obligation to raise the exception sua sponte.  On reply, Father appears to concede that the Agency's argument is "legally correct."

To the extent Father concedes that the issue was forfeited, such a concession is well-founded.  The record reflects Father's counsel did not raise or discuss the beneficial parent-child relationship exception at the February 2024 selection and implementation hearing, and only focused on Father's progress in addressing his substance and alcohol

19

abuse.  Indeed, the only reference to the exception appears in the adoption assessment, which concluded that the exception did not apply based on both parents' inability to meet J.L.'s needs and provide him with a safe and stable home.  Accordingly, because Father bore the burden of proof to establish that the exception applied, counsel's failure to raise the exception below constituted forfeiture of the issue on appeal, and the court was under no obligation to independently determine whether the exception applied.

## C.　　Ineffective Assistance of Counsel

Father alternatively claims that if we find forfeiture of the above issues, he received ineffective assistance based on counsel's failure to object to the missing page in the Agency's report, which would have provided sufficient evidence to support the beneficial parent-child relationship exception.  He further claims he received ineffective assistance based on counsel's failure to object to the court taking the Agency's counsel's statement regarding visitation into evidence.

In a dependency proceeding, a parent seeking to establish ineffective assistance of counsel must show both that counsel failed to act in a manner to be expected of a reasonably competent attorney practicing in the field of juvenile dependency law, and it is " 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1668; see also *In re A.R.* (2021) 11 Cal.5th 234, 247 [affirming holding of *Kristen H.* and similar decisions "[a]s a general rule, a parent who has not received competent representation in juvenile dependency proceedings is entitled to seek relief based on denial of the statutory right"].)  When a parent seeks to assert ineffective assistance of counsel on direct appeal, appellate courts further limit their review to consider only those claims " 'where "there simply could be no satisfactory explanation" for trial counsel's action or inaction.' " (*In re Darlice C.* (2003) 105 Cal.App.4th 459, 463, quoting *In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.)

20

Turning to Father's claims, the record does not reflect that counsel's failure to object fell below an objective standard of reasonableness, or that it is reasonably probable Father would have achieved a more favorable result in the absence of such error. With respect to deficient performance, counsel filed a section 388 petition specifically to object to the termination of parental rights, which had not originally been recommended at the first selection and implementation hearing. In the petition, counsel briefly described the strength of the relationship between Father and J.L., and also provided documentation in the petition with specific details regarding Father's visitation and contact with J.L.—the very details that were apparently missing from the Agency's report. Additionally, as described above, information regarding Father's visitation with J.L. had been documented in the January 2024 adoption assessment. Moreover, the representation made by the Agency's counsel regarding Father's visitation with J.L.—namely, that visits took place once a month—was the same information provided in both the adoption assessment and Father's section 388 petition. Accordingly, counsel could have reasonably concluded that it was unnecessary to raise any objections regarding the missing page from the report when the same information was already before the court. Further, as indicated above, the adoption assessment specifically reported that it did not find the beneficial parent-child relationship exception applicable, based on the parents' continued substance abuse issues and inability to provide a safe and stable home for J.L. Therefore, counsel could have rationally concluded that raising this exception to adoption would have been futile or meritless. (See, e.g., *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["[f]ailure to raise a meritless objection is not ineffective assistance of counsel"].)

With respect to prejudice, namely, the reasonable probability of a different outcome, we again find that there was nothing in the record to demonstrate Father's parental rights would not have been terminated if counsel had raised the objections noted above. In denying Father's section 388 petition, the court specifically noted that Father "was given ample opportunity" to remedy the situation he was in and "ensure that

21

relationship and possible reunification," yet did not do so. Based on such statements, we cannot conclude that the court's decision to terminate parental rights rested entirely on the information—or purported lack thereof—regarding Father's visitation with J.L. Consequently, Father has not demonstrated he was prejudiced because he has not met his burden to show a reasonable probability that he would have obtained a more favorable result absent counsel's failure to object.

### III.    DISPOSITION

The juvenile court's order terminating Father's parental rights is affirmed.

_____
                              Wilson, J.

WE CONCUR:


_____
        Greenwood, P. J.



_____
        Grover, J.




*In re J.L.; San Benito County HHS v. A.L.*
H052018